EXHIBIT 1

## CONVERTIBLE NOTE
## PURCHASE AGREEMENT

This Convertible Note Purchase Agreement (this "Agreement"), dated as of [ *Nov 12, 2019* ], is entered into between Key Digital Systems, Inc., a New York corporation (the "Company"), and Hongkong Corenex Technology Co., Limited, a Hong Kong Corporation (the "Purchaser").

## RECITALS

**WHEREAS**, subject to the terms and conditions set forth herein, the Company wishes to issue and sell to the Purchaser, and the Purchaser wishes to purchase from the Company, one or more convertible promissory notes in exchange for two million dollars ($2,000,000.00) in cash and trade credits (the "Consideration") to be paid in accordance with the schedule set forth on Exhibit B hereto (the "Payment Schedule");

**WHEREAS**, the Company and the Purchaser wish for such convertible promissory notes (i) to be convertible at Purchaser's option into equity of a to-be-formed wholly-owned limited liability company subsidiary of the Company (the "Operating LLC"), to which the Company will transfer all or substantially all of its material assets and liabilities (including such convertible notes) at the time of conversion, or (ii) to be repaid pursuant to the terms thereof; and

**WHEREAS**, the Company and [Tonlyware Technology Co., Ltd. ("TNL")], an affiliate of the Purchaser, have, simultaneously with the execution of this Agreement and the convertible note(s) issued hereunder, executed a letter agreement, which includes a commercial term sheet setting forth the terms of the business arrangement of the Company and TNL during the term set forth therein, attached hereto as Exhibit C.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1.    Definitions. Capitalized terms not otherwise defined in this Agreement will have the meanings set forth in this Section 1.

    1.1    "Business Day" means any day that is not a Saturday, Sunday or a day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close

    1.2    "Conversion Equity" means common limited liability company equity of the Operating LLC, whether in units or in membership interests, equal to 25% of the total equity interests of the Operating LLC, having the same rights, privileges, preferences and restrictions as standard units of the Operating LLC, provided that the Operating Agreement shall control the amount of the deemed capital contribution of the Company for all purposes of the Operating Agreement.

1.3     "Note" or "Notes" means the one or more promissory notes issued to the Purchaser pursuant to Section 2, the form of which is attached hereto as Exhibit A.

1.4     "Securities Act" means the Securities Act of 1933, as amended.

2.     Purchase and Sale of Note. In exchange for the Consideration, as paid by the Purchaser in accordance with the provisions of this Section 2, the Company will sell and issue to the Purchaser one or more Notes on the terms and conditions set forth herein.

2.1     Form of Payment. The Consideration may be paid by the Purchaser either by cash or by immediately available credit for goods or services sold by the Purchaser as further described in Section 8.3 hereof (a "Credit"), up to a maximum Credit of two hundred thousand dollars ($200,000). Payment by Credit will not be deemed received unless confirmed in a writing by Purchaser specifying the amount of such Credit and signed by the Company.

2.2     Installment Payments. Each Note will have a principal balance equal to that portion of the Consideration actually paid (each such payment, an "Installment") by the Purchaser for such Note. The Company, upon receipt of each Installment, shall confirm in writing by email to the Purchaser at sales@hdcvt.com, (a) that such Installment has been received, (b) the amount of such Installment received in Credit and the amount of such Installment received in cash, and (c) the then-current aggregate principal balance of all Installments of the Note. The Note purchased pursuant to this Agreement shall not be deemed purchased until all Installments, constituting the entire Consideration, have been paid in full by the Purchaser.

2.3     Payment Terms. Purchaser hereby unconditionally promises to pay to the Company each Installment according to the Payment Schedule in accordance with the terms of this Agreement. All payments made by Purchaser hereunder shall be made either (a) in immediately available funds in US Dollars, without setoff or counterclaim, before 12:00 P.M. Eastern time on the date when due or (b) by Credit in accordance with Section 2.1 hereof. When a payment is due on a day that is not a Business Day, the payment shall be due the previous Business Day.

2.4     Default of Payment. If Purchaser (a) fails to make any payment at the time specified herein and does not cure such failure within a period of three (3) Business Days after receipt of written notice from the Company specifying such failure, (b) fails to perform any other provisions hereof and does not cure such failure within a period of ten (10) Business Days after receipt of written notice from the Company specifying such failure, or (c) becomes insolvent, makes an assignment in favor of creditors or enters bankruptcy or dissolution procedures, the Company may cancel this Agreement without any liability. Upon such termination the Company will have the right, upon notice to Purchaser, to take title to and possession of all or any Notes issued by the Company under this Agreement.

3.     Closings. The initial closing of the sale of the Notes in return for the Consideration paid by the Purchaser (the "Closing") will take place remotely via the exchange of documents and signatures on the date of this Agreement, or at such other time and place as the Company

and the Purchaser agree upon orally or in writing. At the Closing, (x) the Purchaser will deliver the first Installment of the Consideration, in such amount as set forth in the Payment Schedule to the Company and (y) the Company will deliver to the Purchaser a Note (i.e., in the form attached hereto as Exhibit A) in return for the initial Installment.

4.    Conversion. The Note will be convertible into Conversion Equity pursuant to the terms set forth in the Note, on the following conditions:

4.1    Formation of Operating LLC. Prior to any of the conversions set forth in Section 4 hereof, the Company shall have completed the reorganization pursuant to Section 8.1 hereof, or the Company and the Purchaser shall have agreed in writing to waive this provision.

4.2    Conversion Agreements. The Purchaser acknowledges that the conversion of the Note into Conversion Equity hereof may require the Purchaser's execution of certain agreements relating to the purchase and sale of the Conversion Equity, including but not limited to the Operating Agreement of the Operating LLC, with appropriate variations for the Conversion Equity if applicable, as well as rights of first refusal and co-sale, drag-along rights and rights of first offer, if any, relating to such securities (collectively, the "Conversion Agreements"). The Purchaser agrees to execute all of the Conversion Agreements in connection with the conversion of its Note hereunder. The conversion of the Note may be made contingent upon the execution of the Conversion Agreements.

4.3    Certificates. As promptly as practicable after the conversion of each Note and the issuance of the Conversion Equity, the Company will issue and deliver to the holder thereof a certificate or certificates evidencing the Conversion Equity (if certificated), or if the Conversion Equity is not certificated, will deliver a true and correct copy of the Company's equity register reflecting the Conversion Equity held by such holder. The Company will not be required to issue or deliver the Conversion Equity until the holder of such Note has surrendered the Note to the Company (or provided an instrument of cancellation or affidavit of loss).

5.    Representations and Warranties of the Company. In connection with the transactions contemplated by this Agreement, the Company hereby represents and warrants to the Purchaser as follows:

5.1    Due Organization; Qualification and Good Standing. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify or to be in good standing would have a material adverse effect on the Company.

5.2    Authorization and Enforceability. Except for the authorization and issuance of the Conversion Equity, all corporate action has been taken on the part of the Company and its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the Notes. Except as may be limited by applicable

3

bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditors' rights, the Company has taken all corporate action required to make all of the obligations of the Company reflected in the provisions of this Agreement and the Notes valid and enforceable in accordance with their terms.

6.      Representations and Warranties of the Purchaser. In connection with the transactions contemplated by this Agreement, the Purchaser hereby represents and warrants to the Company as follows:

6.1      Authorization. The Purchaser has full power and authority (and, if the Purchaser is an individual, the capacity) to enter into this Agreement and to perform all obligations required to be performed by it hereunder. This Agreement, when executed and delivered by the Purchaser, will constitute the Purchaser's valid and legally binding obligation, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

6.2      Purchase Entirely for Own Account. The Purchaser acknowledges that this Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which the Purchaser confirms by executing this Agreement, that the Notes, the Conversion Equity, and any equity issuable upon conversion of the Conversion Equity (collectively, the "Securities") will be acquired for investment for the Purchaser's own account, not as a nominee or agent (unless otherwise specified on the Purchaser's signature page hereto), and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Securities. If other than an individual, the Purchaser also represents it has not been organized solely for the purpose of acquiring the Securities.

6.3      Disclosure of Information; Non-Reliance. The Purchaser acknowledges that it has received all the information it considers necessary or appropriate to enable it to make an informed decision concerning an investment in the Securities. The Purchaser further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities. The Purchaser confirms that the Company has not given any guarantee or representation as to the potential success, return, effect or benefit (either legal, regulatory, tax, financial, accounting or otherwise) of an investment in the Securities. In deciding to purchase the Securities, the Purchaser is not relying on the advice or recommendations of the Company and the Purchaser has made its own independent decision that the investment in the Securities is suitable and appropriate for the Purchaser. The Purchaser understands that no federal or state agency has passed upon the merits or risks of an investment in the Securities or made any finding or determination concerning the fairness or advisability of this investment.

6.4    <u>Investment Experience</u>. The Purchaser is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities.

6.5    <u>Accredited Investor</u>. The Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act. The Purchaser agrees to furnish any additional information requested by the Company to assure compliance with applicable U.S. federal and state securities laws in connection with the purchase and sale of the Securities.

6.6    <u>Restricted Securities</u>. The Purchaser understands that the Securities have not been, and will not be, registered under the Securities Act or any state securities laws, by reason of specific exemptions under the provisions thereof which depend upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Securities are "restricted securities" under U.S. federal and applicable state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission ("<u>SEC</u>") and registered or qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that the Company has no obligation to register or qualify the Securities for resale and further acknowledges that, if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation, and may not be able, to satisfy.

6.7    <u>No Public Market</u>. The Purchaser understands that no public market now exists for the Securities and that the Company has made no assurances that a public market will ever exist for the Securities.

6.8    <u>No General Solicitation</u>. The Purchaser, and its officers, directors, employees, agents, stockholders or partners have not either directly or indirectly, including through a broker or finder, solicited offers for or offered or sold the Securities by means of any form of general solicitation or general advertising within the meaning of Rule 502 of Regulation D under the Securities Act or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act. The Purchaser acknowledges that neither the Company nor any other person offered to sell the Securities to it by means of any form of general solicitation or advertising within the meaning of Rule 502 of Regulation D under the Securities Act or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act.

6.9    <u>Residence</u>. If the Purchaser is an individual, the Purchaser resides in the state or province identified in the address shown on the Purchaser's signature page hereto. If the Purchaser is a partnership, corporation, limited liability company or other entity, the

Purchaser's principal place of business is located in the state or province identified in the address shown on the Purchaser's signature page hereto.

6.10    Foreign Investors. If a Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), the Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (a) the legal requirements within its jurisdiction for the purchase of the Securities; (b) any foreign exchange restrictions applicable to such purchase; (c) any governmental or other consents that may need to be obtained; and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, conversion, redemption, sale, or transfer of the Securities. The Purchaser's subscription and payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Purchaser's jurisdiction. The Purchaser acknowledges that the Company has taken no action in foreign jurisdictions with respect to the Securities.

7.    Repayment Commencement Date. Subject to the terms and conditions of the Note, the Purchaser may, upon 10 days' written notice to the Company (the "RCD Election"), select a date from April 2, 2020, to April 1, 2026 (the "Election Period"), on which repayment of the Note will commence (the "Repayment Commencement Date"); provided, that if the Purchaser has not given the RCD Election by the date 10 days before the close of the Election Period, the Repayment Commencement Date will be April 1, 2026.

8.    Covenants.

8.1    Operating LLC.  The Company shall use its reasonable best efforts to take, or cause to be taken, any and all actions to consummate and make effective, on or before the date 3 months after the Repayment Commencement Date, (a) the formation and organization of the Operating LLC and (b) the contribution of all of its material assets to the Operating LLC, whether by assignment, sale, or merger with the Operating LLC (same to be determined in conjunction with the company's counsel and tax advisors), such that, at the time of conversion of the Note into Conversion Equity, the Operating LLC will hold all or substantially all of the assets of the Company, and the Company shall thereafter conduct its business through the Operating LLC (the "Restructuring").  Purchaser agrees that in connection with the contribution of the assets, the Company shall have the right to assign to Operating LLC, and to cause Operating LLC to assume, all obligations under the Notes, and upon such assignment and assumption, Company shall have no further obligations under the Notes.  Notwithstanding the foregoing, the parties hereto agree that the Company shall not be required to create, form, or contribute its assets to the Operating LLC in the event of a default by Purchaser under this Agreement or any Note, and that the requirements set forth in this Section 8.1 shall be conditioned on the conversion of the Note to Conversion Equity in accordance with the terms of this Agreement and any Note or Notes purchased hereunder.

8.2    Reserved.

8.3    Payment by Credit. Purchaser hereby agrees that Credit exchanged for the Notes pursuant to Section 2.1 hereof shall be redeemable for any goods or services currently provided by Purchaser, without limitation. Any goods or services provided by Purchaser on Credit shall be on no less favorable terms to the Company (including but not limited to price, quality, benefits, service, shipping, warranties and other terms and conditions, as applicable) as similar goods or services provided to those currently being offered or that will be offered by the Purchaser to any of its customers.

9.    Miscellaneous.

9.1    Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement will inure to the benefit of, and be binding upon, the respective successors and assigns of the parties; provided, however, that the Purchaser may not assign its obligations under this Agreement without the written consent of the Company. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.2    Choice of Law. This Agreement and the Notes, and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, or statute, will be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of New York.

9.3    Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via facsimile, email (including PDF or electronic signature) or other transmission method, and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

9.4    Titles and Subtitles. The titles and subtitles used in this Agreement are included for convenience only and are not to be considered in construing or interpreting this Agreement.

9.5    Notices. All notices and other communications given or made pursuant hereto will be in writing and will be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) when sent by email (receipt confirmed) or confirmed facsimile; (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications will be sent to the respective parties at the addresses shown on the signature pages hereto (or to such email address, facsimile number or other address as subsequently modified by written notice given in accordance with this Section 9.5).

A notice by email will be deemed to have been confirmed when the recipient, by an email

sent to the email address for the sender or by a notice delivered by another method in accordance with this Section 9.5, acknowledges having received that email, with an automatic "read receipt" not constituting acknowledgment of an email for purposes of this Section 9.5.

9.6    No Finder's Fee. Each party represents that it neither is nor will be obligated to pay any finder's fee, broker's fee or commission in connection with the transactions contemplated by this Agreement. The Purchaser agrees to indemnify and to hold the Company harmless from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of the transactions contemplated by this Agreement (and the costs and expenses of defending against such liability or asserted liability) for which the Purchaser or any of its officers, employees or representatives is responsible. The Company agrees to indemnify and hold the Purchaser harmless from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of the transactions contemplated by this Agreement (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

9.7    Expenses. Each party will pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement.

9.8    Attorneys' Fees. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

9.9    Entire Agreement; Amendments and Waivers. This Agreement, the Notes and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. The Company's agreements with the Purchaser are separate agreements, and the sales of the Notes to the Purchaser are separate sales. Notwithstanding the foregoing, any term of this Agreement or the Notes may be amended and the observance of any term of this Agreement or the Notes may be waived (either generally or in a particular instance and either retroactively or prospectively) with the written consent of the Company and the Purchaser. Any waiver or amendment effected in accordance with this Section 9.9 will be binding upon each party to this Agreement and each holder of a Note purchased under this Agreement then outstanding and each future holder of all such Notes.

9.10    Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions will be excluded from this Agreement and the balance of the Agreement will be interpreted as if such provisions were so excluded and this Agreement will be enforceable in accordance with its terms.

9.11    Transfer Restrictions.

(a)    Limitations on Disposition. Without in any way limiting the representations and warranties set forth in this Agreement, the Purchaser agrees not to

make any disposition of all or any portion of the Securities unless and until the transferee has agreed in writing for the benefit of the Company to make the representations and warranties set out in Section 6 and:  (i) there is then in effect a registration statement under the Securities Act covering such proposed disposition, and such disposition is made in connection with such registration statement; or (ii) the Purchaser has (A) notified the Company of the proposed disposition; (B) furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition; and (C) if requested by the Company, furnished the Company with an opinion of counsel reasonably satisfactory to the Company that such disposition will not require registration under the Securities Act.  The Purchaser agrees that it will not make any disposition of any of the Securities to the Company's competitors, as determined in good faith by the Company.

(b)    Legends. The Purchaser understands and acknowledges that the Securities may bear the following legend:

THIS INSTRUMENT AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR UPON RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT.

9.12    Acknowledgment. For the avoidance of doubt, it is acknowledged that the Purchaser's rights with respect to the Conversion Equity will not be adversely affected by any adjustments in the number of shares of the Company's capital stock as a result of any splits, recapitalizations, combinations or other similar transactions affecting the Company's capital stock that occur prior to the conversion of the Notes.

9.13    Further Assurances. From time to time, the parties will execute and deliver such additional documents and will provide such additional information as may reasonably be required to carry out the terms of this Agreement, the Notes, and the Conversion Agreements and any agreements executed in connection herewith or therewith.

9.14    Waiver of Jury Trial. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY

FURTHER REPRESENTS AND WARRANTS THAT SUCH PARTY HAS REVIEWED
THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY
KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS
FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

**COMPANY**

**Key Digital Systems, Inc.**

By:_____
**Name:** Mike Tsinberg
**Title:**    Chief Executive Officer
**Address:**
521 E 3rd St.
Mount Vernon, NY 10553
**Email Address:** mike@keydigital.com

By:_____
**Name:** Masha Lakhter
**Title:** Chief Operations Officer

By:_____
**Name:** Faina Tsinberg
**Title:** Direct of Operations

11

**PURCHASER**

**Hongkong Corenex Technology Co., Limited**

**By:**

**Name:** Mr. Zhou Qingquan

**Title:** President

**Address:**

**12/F San Toi Building, 137-139 Connaught Road, Central Hong Kong**

**Email Address:** sales@hdcvt.com

## Exhibit A

**Form of Convertible Promissory Note**

(See attached)

## Exhibit B

### Payment Schedule

Initial Closing Date: [_____]

| DATE | INSTALLMENT (INCLUDING PORTIONS IN CREDIT AND IN CASH) | CONVERTIBLE EQUITY PERCENTAGE | CASH OR CREDIT RECEIVED OR SCHEDULED |
|---|---|---|---|
| JUNE 1, 2018 | $300,000 | 3% | CASH RECEIVED |
| JULY 1, 2018 | $100,000 | 1% | CASH RECEIVED |
| AUGUST 1, 2018 | $100,000 | 1% | CASH RECEIVED |
| SEPTEMBER 1, 2018 | $100,000 | 1% | CASH RECEIVED |
| OCTOBER 1, 2018 | $100,000 | 1% | CASH RECEIVED |
| NOVEMBER 1, 2018 | $100,000 | 1% | CASH RECEIVED |
| DECEMBER 1, 2018 | $200,000 | 2% | CREDIT RECEIVED |
| *TOTAL RECEIVED FOR 2018* | *1,000,000.00* | *10%* | *CASH AND CREDIT* |
| SEPTEMBER 1, 2019 | $300,000 | 4.5% | $100,000 CASH, $200,000 CREDIT |
| OCTOBER 1, 2019 | $100,000 | 1.5% | CASH |
| NOVEMBER 1, 2019 | $100,000 | 1.5% | CASH |
| DECEMBER 1, 2019 | $100,000 | 1.5% | CASH |
| JANUARY 1, 2020 | $100,000 | 1.5% | CASH |
| FEBRUARY 1, 2020 | $100,000 | 1.5% | CASH |
| MARCH 1, 2020 | $100,000 | 1.5% | CASH |
| APRIL 1, 2020 | $100,000 | 1.5% | CASH |
| *TOTAL FOR 2018, 2019, 2020* | *$2,000,000.00* | *25.0%* | *CASH AND CREDIT* |

**Exhibit C**

Commercial Term Sheet

(See attached)

**THIS NOTE AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.**

#### CONVERTIBLE PROMISSORY NOTE

Up to $2,000,000                                    Nov 12 2019

**FOR VALUE RECEIVED, Key Digital Systems, Inc.**, a New York corporation ("Company"), promises to pay to [Hongkong Corenex Technology Co., Limited, a Hong Kong Corporation] ("Holder"), the principal sum of (x) Two Million Dollars ($2,000,000) or (y) if less, such lesser amount as is actually paid to the Company (the "Investment Amount") under the Payment Schedule to that certain Note Purchase Agreement by and between the parties hereto and of even date herewith (the "Note Purchase Agreement"), in each case pursuant to the terms set forth in this Convertible Promissory Note (this "Note") until paid in full as provided below.  Such amounts due under this Note are to be paid at the times and in the manner provided below. Company and Holder may each be referred to as a "Party" or together as the "Parties" in this Note, and capitalized terms not otherwise defined herein shall have the meaning set forth in the Note Purchase Agreement.

1.    **Defined Terms**.

1.1.  "**Business Day**" means any day that is not a Saturday, Sunday or a day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close

1.2.  "**Change of Control**" means any transaction or series of transactions pursuant to which any Person in the aggregate, acquires (a) more than 50% of the total equity interests of the Company (whether by merger, consolidation, reorganization, combination, sale or transfer of the equity of the Company) or, if applicable, the other surviving entity in such transaction or (b) all or substantially all of the Company's assets determined on a consolidated basis.  For the avoidance of doubt, any transaction meeting the above description that is conducted entirely between any combination of (i) the shareholders of the Company, (ii) the members of the Operating LLC, (iii) the Company, (iv) the Operating LLC, or (v) a subsidiary or affiliate of the Company as of the date hereof, shall not be considered a Change of Control.

1.3.  "**Conversion Equity**" means common limited liability company equity of the Operating LLC, whether in units or in membership interests, equal to 25% of the total equity interests of the Operating LLC, having the same rights, privileges, preferences and restrictions as standard units of the Operating LLC, provided that the Operating Agreement shall control the amount of the deemed capital contribution of the Company for all purposes of the Operating Agreement.

1.4.  "**Dissolution Event**" means (a) a voluntary termination of operations, (b) a general assignment for the benefit of the Company's creditors, or (c) any other liquidation, dissolution or winding up of the Company (excluding a Liquidity Event), whether voluntary or involuntary.

1.5.  "**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of common stock pursuant to a registration statement filed under the Securities Act.

    1.6.  "**Liquidity Event**" means a Change of Control or an Initial Public Offering.

    1.7.  "**Operating LLC**" means a to-be-formed wholly-owned limited liability company subsidiary of the Company, to which the Company has agreed it will transfer all or substantially all of its material assets at the time of conversion of this Note pursuant to Section 8.1 of the Note Purchase Agreement.

    1.8.  "**Outstanding Balance**" means the outstanding principal balance and any and all accrued but unpaid interest due under this Note.

    1.9.  "**Person**" means and includes any natural person, corporation, firm, joint venture, partnership, limited liability company, trust, unincorporated organization, government or any department, political subdivision or agency of a government.

    2.    **Interest Rate**. The Investment Amount outstanding under this Note will bear interest at a rate equal to (a) prior to the Repayment Commencement Date, two and twelve one-hundredths percent (2.12%) and (b) from the Repayment Commencement Date until the Maturity Date, five percent (5%) (computed on the basis of the actual number of days elapsed in a 365-day year) per annum.

    3.    **Payments of Interest and Principal**. Interest, based on a sixty (60) month amortization schedule with the final payment of principal and interest due on the fifth anniversary of the Repayment Commencement Date (the "Maturity Date"), will be payable annually in arrears, with the first payment due on the Repayment Commencement Date. The Outstanding Balance will be payable in full upon the earlier of a Liquidity Event or a Dissolution Event, *provided* that if the Outstanding Balance of the Note is converted to Conversion Equity in accordance with Section 5 hereof, any interest payable shall be paid in cash, and only the Investment Amount shall be converted to Conversion Equity. No principal will be payable prior to the Repayment Commencement Date, although the Company, in its sole discretion, shall have the right to prepay any of the principal prior to such time. The Company shall be entitled to impose any withholding in respect of any payments under this Note as required by law, and Holder may submit properly completed Internal Revenue Service or other applicable tax authority forms to reduce or eliminate any such withholding as permitted under applicable law.

    4.    **Maturity Date**. Unless converted earlier in connection with Section 5 hereof, all amounts outstanding under this Note, including, if paid in cash, all accrued and unpaid interest, will be due in full on the Maturity Date, subject to the terms of payment set forth in Section 3 hereof.

    5.    **Events.**

        5.1.  **Liquidity Event**. If there is a Liquidity Event before the conversion of this Note or the Maturity Date, (a) if Holder has made all Installment payments pursuant to the Purchase Agreement (i.e., totaling $2,000,000), the Holder will, at its option, either (i) receive a cash payment equal to the Outstanding Balance (subject to the following sentence) or (ii) receive from the Company, prior to the closing of the Liquidity Event, the Conversion Equity and (b) if Holder has not at such time made aggregate Installment payments of $2,000,000, all Installments paid on this Note shall be repaid to Holder in accordance with Section 3 hereof. In connection with this Section 5.1, the Outstanding Balance will be due and payable by the Company to the Holder immediately prior to the consummation of the Liquidity Event, *provided*, *however*, that the Company may pay to Holder such funds out of the funds received due to the Liquidity Event simultaneous with the closing of such Liquidity Event.

        5.2.  **Repayment Date, Default or Dissolution**. If there is no conversion of this Note before the Repayment Commencement Date, the Company will, on the Repayment Commencement Date, at the Holder's election (a) commence payment of an amount equal to the Outstanding Balance, payable

to the Holder in accordance with Section 3 hereof or (b) commence the Restructuring in accordance with Section 8.1 of the Note Purchase Agreement and, upon consummation thereof, convert the Note to conversion equity. If the Holder has not given such election on or before the Repayment Commencement Date, the Company will then commence the Restructuring in accordance with Section 8.1 of the Note Purchase Agreement and, upon consummation thereof, convert the Note to conversion equity.

       5.3.  **Deemed Contribution**. In the event that the Holder elects to convert this Note into Conversion Equity pursuant to this Section 5, such conversion will be deemed a contribution to the Operating LLC in an amount equal to the Investment Amount, in exchange for Conversion Equity.

    6.  **Default**.

       6.1.  **Events of Default**. Unless otherwise waived in writing by the non-defaulting party, the occurrence and continuance of any one or more of the following events will constitute an event of default under the Note (each an "Event of Default"):

       6.1.1.  If Holder fails to make any Installment payment as due under the Payment Schedule to the Note Purchase Agreement on the terms and conditions set forth in the Note Purchase Agreement, and such failure is not cured within three (3) Business Days after Company provides notice to Holder of such default;

       6.1.2.  If Company fails to satisfy its obligations pursuant to Section 5 of the Note, which is not cured within ten (10) Business Days after Holder provides notice to Company of such default;

       6.1.3.  If, pursuant to or within the meaning of the United States Bankruptcy Code or any other federal, state, or foreign law relating to insolvency or the relief of debtors, Company (a) commences a voluntary case or proceeding; (b) consents to the entry of an order for relief against it in an involuntary case; (c) consents to the appointment of a trustee, receiver, assignee, liquidator, or similar official; (d) makes an assignment for the benefit of its creditors; or (e) admits in writing its inability to pay its debts as they become due; or

       6.1.4.  The breach by Company or Holder of any of its representations, warranties, covenants or obligations under any of this Note or the Note Purchase Agreement, which breach, to the extent curable, is not cured within ten (10) days after the non-defaulting party provides written notice to the defaulting party of such breach.

       6.2.  **Remedies**. Upon the occurrence of an Event of Default specified in Section 6.1 (unless such Event of Default has been waived by the non-defaulting party), (a) upon an Event of Default of the Company, Holder may, by written notice to Company, declare all amounts outstanding under this Note to have fully matured, in which case this Note will be payable in accordance with Section 3, or (b) upon an Event of Default of Holder, the Company may, by written notice to Holder, declare this Note cancelled, in which case neither party will have any further obligations under this Note or the Note Purchase Agreement, as applicable.

       6.3.  **Fees and Costs**. Upon the occurrence of an Event of Default specified in Section 6.1 (unless such Event of Default has been waived by the non-defaulting party), the defaulting party shall pay all of the non-defaulting party's reasonable costs, fees and expenses resulting from the defaulting party's enforcement of its rights pursuant to the Note, including reasonable attorneys' fees.

    7.  **Miscellaneous**.

7.1.    Any provision of this Note may be amended, waived or modified only upon the written consent of the Company and the Holder.

7.2.    Any notice required or permitted by this Note will be deemed sufficient when delivered personally or by overnight courier or sent by email (receipt confirmed) to the relevant address listed on the signature page, or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

A notice by email will be deemed to have been confirmed when the recipient, by an email sent to the email address for the sender or by a notice delivered by another method in accordance with this Section 7.2, acknowledges having received that email, with an automatic "read receipt" not constituting acknowledgment of an email for purposes of this Section 7.2.

7.3.    The Holder is not entitled, as a holder of this Note, to vote or receive dividends or be deemed the holder of capital for any purpose, nor will anything contained herein be construed to confer on the Holder, as such, any of the rights of an equity holder of the Company or any right to vote upon any matter submitted to equity holders of the Company at any meeting thereof, or to give or withhold consent to any Company action or to receive notice of meetings, or to receive subscription rights or otherwise until units have been issued upon the terms described herein.

7.4.    Neither this Note nor the rights contained herein may be assigned, by operation of law or otherwise, by Holder without the prior written consent of the Company. The Company may assign this Note in whole, without the consent of the Holder, in connection with (x) the transfer or sale of all or substantially all of the business, assets or equity of the Company or (y) a reorganization to change the Company's domicile.

7.5.    In the event any one or more of the provisions of this Note is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Note operate or would prospectively operate to invalidate this Note, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Note and the remaining provisions of this Note will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

7.6.    All rights and obligations hereunder will be governed by the laws of the State of New York, without regard to the conflicts of law provisions of such jurisdiction.

*(Signature page follows)*

IN WITNESS WHEREOF, the undersigned have caused this Note to be duly executed and delivered.

**COMPANY**

**Key Digital Systems, Inc.**

By:_____
**Name:**  Mike Tsinberg
**Title:**    Chief Executive Officer
**Address:**
521 E 3rd St.
Mount Vernon, NY 10553
**Email Address:** mike@keydigital.com

By:_____
**Name:**  Masha Lakhter
**Title:**    Chief Operations Officer

By:_____
**Name:**  Faina Tsinberg
**Title:**    Direct of Operations

**HOLDER**

**Hongkong Corenex Technology Co., Limited**

By:_____
**Name:** Mr. Zhou Qingquan
**Title:** President

**Address:**

**12/F San Toi Building, 137-139 Connaught
Road, Central Hong Kong**

**Email Address**: sales@hdcvt.com